**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. MJM-24-248** |
| | * | |
| **HUNTER HAITHCOCK,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\*\***

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Kelly O. Hayes, United States Attorney for the District of Maryland, and Joseph L. Wenner, Assistant United States Attorney, moves this Court to sentence Defendant Hunter Haithcock ("Haithcock") to the following:

- A total period of at least 63 months' incarceration in the Bureau of Prisons ("BOP"),

- Supervised release of 3 years,

- Restitution of $655,498.93 to Haithcock's victims and a $200 special assessment.[1][2]

For over three years, Haithcock stole hundreds of thousands of dollars from working-class victims. Haithcock ensnared amateur and inexperienced would-be investors into entrusting him with their money—for some, their life savings. While he provided them with false reports indicating that their investments were thriving and encouraged them to invest in new opportunities with him, Haithcock simply used his victims' money to enhance his own lifestyle. Such a long and intimate deception merits a significant sentence.

---

[1]   The government's restitution calculation is set forth *infra* at 24 and in Exhibit 1. The government further asks the Court to impose forfeiture consistent with the government's preliminary orders of forfeiture, which are being separately submitted.

[2]   The parties are in on-going discussions regarding the possibility of an order of payment and offset order in light of the various judgments against Haithcock. The parties will make additional submissions if needed.

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................ 3

   I.      Procedural History.............................................................................................. 3

   II.     Haithcock's Criminal Conduct......................................................................... 3

      A.   Haithcock's Fraudulent Investment Scheme. ............................................. 4

      B.   Haithcock Defrauds Victim J.D. for $110,000. ......................................... 5

      C.   Haithcock Defrauds Victim K.D.H. of $50,000, including a Retirement Fund. ............ 7

      D.   Haithcock Defrauds Victim D.S. of a Year's Worth of Wages. ................................. 8

      E.   Haithcock Defrauds Victim S.R. While She is in Dire Financial Straits...................... 10

      F.   Haithcock Defrauds Victim W.C. of Retirement And Car Purchase Funds. ................ 11

   III.    Sentencing Guidelines..................................................................................... 14

      A.   The Parties Concur on Most Applicable Guidelines...................................... 14

      B.   Haithcock's Offense Level Rises to 30 After the Applicable Enhancements. ............. 14

   IV.    Section 3553(a) and the Appropriate Sentence ............................................. 21

   V.     Restitution ....................................................................................................... 23

CONCLUSION............................................................................................................ 23

**BACKGROUND**

I.   **Procedural History**

On August 21, 2024, a grand jury in the District of Maryland returned a five-count indictment against Haithcock. Indictment, *United States v. Haithcock*, ECF No. 1, MJM-24-cr-248 (D. Md. Aug. 21, 2024). The Indictment charged him with three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One, Two, and Three); one count of investment advisor fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17 (Count Four); and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(5) (Count Five). *Id.* Haithcock was released on conditions following his initial appearance on October 2, 2024. ECF No. 12 & 13. On September 29, 2025, Haithcock pleaded guilty before this Court to Count One and Count Four. ECF Nos. 43-45. Haithcock remained released on conditions.

II.   **Haithcock's Criminal Conduct**

As detailed in the Plea Agreement and stipulated facts, for over three years, Haithcock stole hundreds of thousands of dollars from dozens of victims. *See* ECF No. 44 ("Plea Agreement"). Through false assurances that he was a licensed securities broker and "a full time day trader and client investment adviser with [Company #1]," Haithcock lured amateur and inexperienced investors—working-class individuals—into entrusting him with thousands of dollars of their hard-earned money. He lulled them into a state of confidence, providing them with false reports indicating that their investments were thriving. But when investors sought to withdraw these purported returns, Haithcock's lies unraveled. In reality, Haithcock had used their money for his own purposes: credit card bills, travel expenses, including hotels and flights, meals and entertainment, car payments, and his own cryptocurrency trades. The government's conservative analysis indicates that Haithcock stole over $600,000. Additional evidence demonstrates that

3

Haithcock's crime inflicted substantial financial harm and exploited victims focused on building funds to retire, with limited financial means, and/or little knowledge of investing.

## A.  Haithcock's Fraudulent Investment Scheme.

Haithcock knew his victims. He met them in the community, often through a local church in Maryland, sometimes through word-of-mouth referrals. Plea Agreement at 11. Haithcock lied to his victims from the start of their relationship. He would introduce himself as "Hunter Elliot," and claimed that he worked at a licensed security broker with Company #1 under the supervision of a fellow trader named "M.W." *Id.* None of this was true. *Id.* While "M.W." was a real individual, he had no connection to Haithcock; Haithcock had simply used M.W.'s FINRA Central Registration Depository number as a way to falsely assure investors of his qualifications. *Id.* Haithcock did not have and never had his own license to trade securities. *Id.*

Introductions out of the way, Haithcock would then dazzle his victims with promises of immense profits with no loss. He claimed his investments would provide returns of 100%, 200%, or more. Haithcock would often put such promises in writing. A frequent feature of his scheme was the "Client Broker Agreement" he would send victim investors. Bearing the name "Hunter Elliot" and "Company #1," the agreement would often ensure investors that: "THIS AGREEMENT IS A NO LOSS GUARANTEE. MEANING THE INITIAL INVESTMENT IS SECURED AND AT ANY TIME THE MARKET HAS A CRASH THERE IS NO LOSS TO YOU." *Id.* at 12. Haithcock would often close the deal by lying about the anticipated performance of any potential investments. *Id.*

Once investors sent Haithcock their funds, Haithcock continued to lie to his victims. He would regularly provide his purported investors with "Statement Reports" that listed an investor's "portfolio value" and Haithcock's supposed stock trades. These reports were entirely fabricated.

4

Later, when his victims began asking for their money back, Haithcock would make up reasons why their money was tied up and couldn't be withdrawn. In reality, Haithcock had spent the money himself.

In total, Haithcock defrauded at least 64 individual investors to steal at least $657,138.93. Summaries of five of these victim investors are below. Relying on stipulated facts, text messages from Haithcock's phone, emails from his email accounts, and various financial records, these vignettes further demonstrate how Haithcock devised and executed his scheme to steal from hard-earned savings from vulnerable, middle-class Americans.

**B.  Haithcock Defrauds Victim J.D**. **for $110,000.**

Between February 2021 and February 2022, Victim J.D. made three wire transfers to Haithcock for a total of $110,000 for purported investment. Haithcock began to defraud Victim J.D. in February 2021. After introducing himself as "Hunter Elliot," Haithcock asks Victim J.D. to "tell me a bit about yourself." Exhibit 2 at 2 Victim J.D. explains that he's 61 years old and looking to invest his pension checks to supplement his income from his yard work business. *Id.* at 3. Haithcock proceeds to tell Victim J.D. that any investments would be set up "under your behalf under by advisor['s] approval." He goes on to assure Victim J.D. that "the ones who work with me knows I'm good at what I do so my agreements do state investing with me it's a no loss guarantee MEANING with any amount if the stock market has any crash your initial investment is covered. Yes it's a bold move but it's a way for you to know that I know what I'm doing within the market." *Id.* at 4. The "Client Broker Agreement that Haithcock sent Victim J.D. repeated this pledge: "This agreement is a no loss guarantee. Meaning the initial investment is secured and at any time the market has a crash there is no loss to you." Plea Agreement at 12. Victim J.D., relying on these representations, proceeded to wire $50,000 to Haithcock on February 10. Exhibit 3 at 1. Haithcock

made no investments on Victim J.D.'s behalf.

Multiple times, Haithcock went back to Victim J.D. and pitched new fake investment opportunities. During these pitches, which occurred over text message, Victim J.D. reminded Haithcock how he does not understand the technical aspects of the trades that Haithcock was purportedly recommending. He repeatedly told Haithcock that he was counting on him. This is clear in July 2021, when Haithcock coaxed Victim J.D. into investing an additional $40,000:

- *July 19, 2021*: Haithcock texts Victim J.D. a long text pitching a "trade opportunity." Victim J.D. responds: "Wow thats a mouth full. Im so glad you know what your talkin about. Are you investing, if so how much would I be trying to invest??????" Exhibit 2 at 10
- *July 20, 2021*: Haithcock encourages Victim J.D. to invest an additional $40,000 instead of only $20,000 in the "trade opportunity." Haithcock sends Victim J.D. a lengthy "report" purporting to explain the additional profits. Victim J.D. responded: "You're funny you think I understand any of this stuff Wish I did counting on you I will call credit Union and see what I need to do as far as wiring you 40000." *Id.* at 15

Victim J.D. subsequently wired $40,000 to Haithcock. Exhibit 3 at 2.  Haithcock responded: "Let's do it, would never steer my clients in the wrong direction." Exhibit 2 at 19. Again, Haithcock invested none of this money and proceeded to pocket it himself.

Haithcock continued to exploit Victim J.D. for additional money in early 2022. In January 2022, Haithcock texted Victim J.D.: "I wanted to give you a call for peace of mind and a short idea I have if you were interested in playing downside while markets flush with inflation!" Exhibit 2 at 40. Haithcock followed up again a week later: "I will confidently say now is a good time to really start with a solid initial. At these current levels is more like a market SALE opportunity which doesn't come too too [sic] often." *Id.* at 43. Victim J.D. replied that "I want to really bad," but that he was having difficulty getting his wife on board with investing more. Haithcock offered to "show her the numbers" and texted Victim J.D. a "projection report" of anticipated profits. Victim J.D. proceeded to wire Haithcock $20,000. Exhibit 3 at 3.

6

For the duration of his relationship with Victim J.D., Haithcock would send false and fabricated "Statement Reports" to Victim J.D. Plea Agreement at 12. These purported to show metrics concerning Victim J.D.'s investment portfolio. For example, on April 7, 2022, Defendant sent J.D. a purported "Statement Report" via email that falsely indicated (1) that the size of J.D.'s investment portfolio was $167,163.93; (2) the portfolio consisted of "Options: 35%," "Short Options: 54%," and "Money Market: 11%" and (3) that falsely indicated "WEEKLY TRADES" in the investment portfolio of various equity securities. Plea Agreement at 12. In truth, Haithcock made no investments of any kind on J.D.'s behalf.

### C. Haithcock Defrauds Victim K.D.H. of $50,000, including a Retirement Fund.

Between November 2021 and June 2022, Victim K.D.H. sent three wire transfers to Haithcock for purported investments for a total of $50,000. Haithcock invested none of this money.

After being introduced by a mutual acquaintance, on November 16, 2021, Haithcock texted Victim K.D.H. a six-question introductory questionnaire gauging Victim K.D.H.'s familiarity with investing, how much he wanted to invest, and how long he wanted to keep the funds invested. Victim K.D.H. responded that he wanted to invest $3,500 for 3-6 years, but wasn't familiar with the type of investing Haithcock said he did. Exhibit 4 at 2-3. Haithcock replied that his minimum investment was $5,000, but that he tried to be "very personal with clients" and talk with them one-on-one every 1-2 weeks." *Id.* at 4. He also stated he was only taking longer term clients. *Id.* Haithcock followed up by sending Victim K.D.H. an "Average Yearly Expected Return" report via text. *Id.* at 12. It projected that a $5,000 investment would make a $71,804 return in 5 years. Victim K.D.H. agreed to invest and, on November 23, 2021, wired $5,000 to Haithcock. Exhibit 5 at 1. Haithcock continued to provide Victim K.D.H. with fabricated investment reports.

In April 2022, Victim K.D.H. reached back out to Haithcock. He explained that he had a

Fidelity 401(K) account that "has lost a lot of money since January" and wondered "are there better options for me to growing that money?" Haithcock asked him to send him details on the account and that he could "take a look at it for you." Exhibit 4 at 19-21. In early May, Haithcock responded with an "Average Yearly Expected Return" report via text. *Id.* at 28. It projected that a $40,000 investment would make a $321,500 return in 5 years. On May 18, 2022, he wired $40,000 to Haithcock from his Fidelity account. Exhibit 4 at 39; Exhibit 5 at 2.

Haithcock's exploitation of Victim K.D.H. continued. He texted Victim K.D.H. on presented another good opportunity. In a text purporting to explain the proposed trade, Haithcock concluded: "these plays don't happen often for futures! A good time is always to catch the ride to the bottom and take action on the uprise." Exhibit 4 at 40. On June 16, 2022, Victim K.D.H. wired $5,000 to Haithcock. Exhibit 5 at 3. Haithcock continued to text Victim K.D.H. about potential opportunities through November. Victim K.D.H's last response was: "I'm ready to make this money I need to retire. Exhibit 4 at 55.

### D. Haithcock Defrauds Victim D.S. of a Year's Worth of Wages.

As his victim impact statement explains, Victim D.S. is a pastor at a Maryland church who maintained additional jobs on the side. Exhibit 6 at 2-3. Between June 1, 2020 and March 1, 2022, Victim D.S. wrote multiple checks to Haithcock for purported investments for a total of $46,465. Evidence also suggests that Victim D.S. provided Haithcock with thousands more in cash. Haithcock invested none of this money.

Haithcock and Victim D.S. began texting each other in April 2020. Haithcock texted Victim D.S. the usual six-question introductory questionnaire gauging Victim D.S.'s familiarity with investing, how much he wanted to invest, and how long he wanted to keep the funds invested. Victim D.S. responded that he wanted to invest $30,000, he was not familiar with investing, and

that he'd never heard of Company #1. Exhibit 7 at 5-6. Haithcock then pitched himself:

- "I'm very successful at what I do"

- "Here's a personal portfolio of mine as an example for you, beginning of last year I put in $60K like I usually do every year between $10-$90K. That $60K turned to $167,000 in the span of a year February 9th.

- "I'm good at what I do so my agreements do state investing with me it's a no loss guarantee MEANING with any amount if the stock market has any crash I'll personally give you 100% of your initial investment to you out of pocket. Yes it's a bold move but it's a way for you to know that I know what I'm doing."

*Id.* at 7. Text messages indicate that—because Victim D.S. could not afford the desired investment amount up front—Victim D.S. and Haithcock set up an arrangement where Haithcock "fronted" money to open an investment account for Victim D.S., and Victim D.S. would pay him on installments. *Id.* at 8.

Haithcock proceeded to regularly communicate with Victim D.S. On May 12, 2020, he sent Victim D.S. a status report claiming that his investments were currently valued at $40,018.97. Exhibit 7 at 22-26. Victim D.S. responded: "Thanks Hunter, looks good to me bro, I'm glad [you're] the think tank in these investments, way above my pay scale….." *Id.* at 26. By September 2020, Haithcock was sending Victim D.S. status reports indicating that Victim D.S. had over $115,000 in his investment account. Victim D.S. expressed how grateful he was: "I make 45,000.00 a year at level physically busting my tail in dirty homes and you've nearly made for me what takes a year for me to make , that's cool !!!!" *Id.* at 30, 34. Later, when Victim D.S. stated he planned to give Haithcock more money to invest, Haithcock replied: "Let's get you retired." *Id.* at 41.

Text messages indicate that Haithcock and Victim D.S. saw each other socially as Victim D.S. continued to "invest" money with Haithcock. Victim D.S. invited Haithcock to his family Thanksgiving dinner. Exhibit 7 at 42. Haithcock appears to have attended Victim D.S.'s church

multiple times—as late as April 2022—to see Victim D.S. preach. *Id.* at 51-53, 56. Victim D.S. was providing Haithcock with checks and cash for purported investments throughout this time period.

By June 2022, however, Victim D.S. had begun to ask Haithcock for his money back. Victim D.S. told Haithcock that he had trusted Haithcock, that he had entrusted over half of his retirement to Haithcock, and that he needed that money to fix his home and start a business:

- "Hunter you've always asked me to trust you and I've done that as a friend and I've done that with over half my retirement money that I've worked endlessly for ,late long hot hours so that Debbie would be set if something should happen to me , but I'm starting to feel like I've made a huge mistake by investing it with you."

- "[Y]ou texted me on Wednesday saying you would get me some closure updates that night or by this week ending and nothing yet again, so you can see why I'm starting to have serious doubts about my investments, I'm looking to you my friend to prove me wrong and I hope I am because I need to do major kitchen renovations and I want to start a mowing business and that involves about 35k , so I need to get some clear reassurance from you Hunter so I'm not stressing over these things , have a blessed day   my friend."

Exhibit 7 at 60. Haithcock texted back assurances that something was in the works, and that he hadn't forgotten about Victim D.S.

**E. Haithcock Defrauds Victim S.R. While She is in Dire Financial Straits.**

Between January and October 2021, Victim S.R. transferred $2,800 to Haithcock for him to invest on her behalf. Text messages indicate that Victim S.R. was initially short of the $1,800 she wished to "invest" with Haithcock in January 2021. Exhibit 9 at 10. As she explained to Haithcock, "I ain't gonna lie I'm broke as hell until my next unemployment payment hit my account on Tuesday! I got like 50$ to my name." *Id.* at 15. Haithcock told her: "I can help you out! I want to secure this spot for you as well." *Id.* at 12. Haithcock stated that he would "open" an account for $1,800 for Victim S.R. and "you'll just owe me." *Id.* Victim S.R. stated: "I can pay you the money back and that's my written word!" *Id* at 13. Eventually, she did transfer $1,800 to

Haithcock. Exhibit 10 at 1.

Like he did for other victims, Haithcock provided Victim S.R. with status reports. As early as a few weeks following "opening her account," Haithcock provided a status report indicated that Victim S.R.'s account had $3,477. Exhibit 9 at 19. Victim S.R. would typically follow up with questions about abbreviations in the reports and other investment questions. Relieved by Haithcock's quick answers, she responded: "I am glad you're telling me this." *Id.* at 23.

In September 2021, Haithcock's status report stated that Victim S.R.'s account had increased to $10,323.07. Exhibit 9 at 25. That same month, Victim S.R. stated that she needed to withdraw money from her account because she was behind on her rent and her phone bill. Haithcock was able to give Victim S.R. $1,600. By October, she paid Haithcock another $1,000 via Zelle to "invest." *Id.* at 47; Exhibit 10 at 2-4.

Victim S.R. did not receive any other funds back from Haithcock, despite multiple requests. In June and July 2022, she messaged Haithcock explaining that she was in dire financial circumstances and needed to withdraw funds from her account. Exhibit 9 at 61; ("would you be able to help me pay for summer camp so I can work for the next 2wks [?] . .  I am behind on rent, don't wanna get evicted . . . but I need my kids in camp to work to catch up"). Haithcock did not provide her with any money, stating "You can't rely on portfolio for this matter !!!! It's not how it works." *Id.* at 68. After multiple exchanges in which Victim S.R. demanded her money, she eventually threatened to file a civil and criminal complaint. Haithcock responded: "I will take legal action for Defamation of character if needed." *Id.* at 78.

### F. Haithcock Defrauds Victim W.C. of Retirement And Car Purchase Funds.

Between February 2, 2021 and September 1, 2021, Victim W.C. made two wire transfers and one ACH transfer to Haithcock for purported investments for a total of $46,465. Hunter

11

invested none of this money.

Victim W.C. appears to have received Haithcock's number from a mutual acquaintance in January 2021. He explains to Haithcock that his "goals are to build some wealth to pay [off] my truck and then work towards paying off the house early. Followed by longer term retirement wealth." Exhibit 11 at 3. Haithcock states that most of his clients have a longer term point of view, and—as he does with other victims—assures Victim W.C. that "the ones who work with me knows I'm good at what I do so my agreements do state investing with me it's a no loss guarantee MEANING with any amount if the stock market has any crash your initial investment is covered. Yes it's a bold move but it's a way for you to know that I know what I'm doing within the market." *Id.* at 5. On January 31, 2021, Victim W.C. texted Haithcock: "How does 5k to start sound (I can do more if that's not enough, if you think 10k is better to work with)…" *Id.* at 12. Haithcock replied: "10k will get to 100k before 5k will so that's up to you brotha." On February 2, 2021, Victim W.C. transferred $10,000 to Haithcock for his purported investment account. Exhibit 12 at 1.

In April 2021, Victim W.C. asked Haithcock: "Is there any way I can transfer the positions I am currently holding in my Schwab accounts to you?" Haithcock responded: "I can ask my advisor if that's possible! I'm sure it is." Exhibit 11 at 20. Several days later, on April 14, 2021, Victim W.C. transferred $10,000 to Haithcock for his purported investment account. Exhibit 12 at 3. In the interim, Haithcock had bragged to Victim W.C. about his own purported success as a broker: "This year already I'm on track to make over 3.8 million TOTAL"; "I made PROFIT WISE upwards of 2.24 million and 95% is in assets/ back dispersed owned property." Exhibit 11 at 17.

After these deposits, Haithcock discouraged Victim W.C. from withdrawing funds early and deviating from his "long term strategy." In August 2021, Victim W.C. asked Haithcock: "Do

you think I'll be able to take out 100k when we reach there to help bring down my house loan balance[?]" Exhibit 11 at 33. Haithcock replied: "I'd say it depends on the time but changing direction of the portfolios as a whole would shorten the contracts that you currently have as well as the consistency of gains you're currently receiving. Never impossible but definitely difficult since it's set up as a longer term portfolio as we discussed before." *Id.* at 35. Victim W.C. was sufficiently dissuaded: "Sounds good, we will let it ride then." *Id.*

Later that same month, Haithcock pitched a new investment to Victim W.C.: "Would a short term portfolio spark interest?" Exhibit 11 at 37. Victim W.C. was interested, as he was trying to save money to purchase a truck: "Let's do the 9-15 month short term . . . How about 5k for the initial value. This is to help me get the truck to pull the RV." *Id.* at 43. Haithcock recommended investing an additional $10,000 instead. Victim W.C. agreed, but clarified that "I'll have to get 2 more pay checks for 10k mate." *Id.* at 44.

Over a month later on September 29, 2021, after two additional pay periods, Victim W.C. transferred $10,000 to Haithcock. Exhibit 12 at 3. Again, Victim W.C. communicated his intention to use this investment to purchase a truck. "I'm counting on that one for the truck." Exhibit 11 at 46.

Later, in June 2022, Victim W.C. texted Haithcock to inform him that Victim W.C. wanted to "liquidate the assets in those accounts." Exhibit 11 at 50. Haithcock initially expressed surprise, but then assured Victim W.C. "I'll take care of it tho, just be patient and it'll be handled." *Id.* at 57. By early August, however, Haithcock hadn't sent Victim W.C. any money. Victim W.C. texted on August 4, 2022: "I've been very patient Hunter. What's going on?" *Id.* at 58. Two days, later Victim W.C. explained to Haithcock that he had been robbed: "Hey man, just give me my 30k investment back. Look, I got robbed and need my money." *Id.* at 59. Haithcock repeatedly assured

Victim W.C. that the money was on its way. The money never came.

### III.    Sentencing Guidelines

#### A.  The Parties Concur on Most Applicable Guidelines.

The government agrees with the PSR that Counts One and Four are grouped for guideline calculation purposes. *See* U.S.S.G. §3D1.2(c); PSR at 8. Count One provides the relevant metrics for calculation purposes because it produces the highest offense level. *Id.*

The underlying calculation for Count One represents a base offense level of seven (7), with a fourteen (14) level increase due to losses that were more than $550,000 but less than $1,500,000. *Id.* The parties have stipulated, and the PSR agrees, that the offense level should be increased (i) by two (2) levels because the offense involved 10 or more victims;[3] (ii) by two (2) levels because the scheme involved sophisticated means, and Haithcock intentionally engaged in or caused the conduct constituting sophisticated means. *Id*. The parties and the PSR also concur that four (4) levels are added because the offense involved a violation of securities law and, at the time of the offense, Haithcock was an investment adviser, or a person associated with an investment adviser. *Id.* After a three-level reduction for acceptance of responsibility, the adjusted offense level— before addressing the contested enhancements—is twenty-six (26). *Id.*

#### B.  Haithcock's Offense Level Rises to 30 After the Applicable Enhancements.

In the Plea Agreement, the parties left several potential sentencing enhancements open for argument. These include: (1) whether Haithcock should receive a four-level increase because his offense resulted in substantial financial hardship to five or more victims; (2) whether Haithcock is

---

[3]    The parties agree that the ten or more victims enhancement applies only if the substantial harm to five or more victims enhancement does not. *See* Plea Agreement at 5; *infra* at 15.

ineligible for a two level reduction under §4C1.1 because he personally caused substantial financial harm; and (3) whether Haithcock should receive a two-level increase because he knew or should have known that a victim of his offense was a "vulnerable victim." For the reasons below, the Court should answer all three of these open questions in the affirmative.

    *1.  Haithcock caused substantial financial harm to at least five victims.*

Haithcock's investment fraud scheme stole funds from working-class individuals and caused substantial financial harm to at least five of his victims. This Court should apply the four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B).

Four levels are added when the defendant's offense "resulted in substantial financial hardship to five or more victims." U.S.S.G. § 2B1.1(b)(2)(B). When determining whether to apply an enhancement for substantial financial hardship, "a court should consider whether the offense resulted in a victim: becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education, savings, or investment fund; making substantial changes to their employment; making substantial changes to their living arrangements; or suffering substantial harm to their ability to obtain credit." *United States v. Amin*, 839 F. App'x 810, 811–12 (4th Cir. 2021) (citing U.S.S.G. § 2B1.1 cmt. n.4(F)). Moreover, various courts of appeals have held that "substantial financial hardship is 'a loss' that 'significantly impacts the victim's resources.'" *United States v. Day*, 117 F.4th 622, 626 (5th Cir. 2024); *see also United States v. Poulson*, 871 F.3d 261, 269 (3d Cir. 2017) ("When applying the term financial hardship in the sentencing context, therefore, we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim."); *United States v. Minhas*, 850 F.3d 873, 879 (7th Cir. 2017) (recognizing that a "substantial financial hardship" can include the "being deprived of [an] opportunity" because "it is a significant alteration in life circumstances"). Similarly, when

determining whether a substantial financial hardship exists, district courts should "draw[ ] inferences based on a variety of facts." *Poulson*, 871 F.3d at 269.

Here, Haithcock's actions devastated the savings of multiple victims. As discussed above and explained below, the contemporaneous text messages, bank statements, and victim impact statements demonstrate that Haithcock caused substantial financial hardship for at least five (if not more) of the investors:

- **Victim D.S.**: Victim D.S. sent Haithcock at least $46,465 in retirement funds for investing. As Victim D.S. explains in his victim impact statement: "I [] stressed to [Haithcock] that this was my retirement money that I worked very long hours for." Exhibit 6 at 3. "I make 45,000.00 a year at level physically busting my tail in dirty homes and you've nearly made for me what takes a year for me to make," Haithcock replied: "Let's get you retired." Exhibit 7 at 41. Victim D.S. further explains that "this was a great loss for my wife and I. Because of my age I don't have the time (or) energy to re-coup this loss." Exhibit 6 at 3.

- **Victim S.R.**: While Victim S.R. only sent Haithcock a few thousand dollars, the contemporaneous text messages she exchanged with Hunter demonstrate how this modest sum pushed Victim S.R. to her financial limits. As she explained to Hunter shortly before she sent him $1,800: "I ain't gonna lie I'm broke as hell until my next unemployment payment hit my account on Tuesday! I got like 50$ to my name." Exhibit 9 at 15. Later, when Victim S.R. was attempting to withdraw her investments, she told Haithcock that she needed the money to pay rent and to pay for childcare so she could work. *Id.* at 61. Haithcock never provided her with that money.

- **Victim W.C.**: Victim W.C. provided Haithcock with $30,000 to invest on his behalf. He

explained to Haithcock that he was investing these funds to pay off and purchase a truck and for his future retirement. Exhibit 11 at 3. As shown in the final text messages exchanged between Haithcock and Victim W.C. show, Victim W.C. had just been robbed and was asking for any of his money Haithcock had that was his. The loss of $30,000 thus interfered with Victim W.C.'s ability to purchase his truck. Exhibit 11 at 46.

- **Victim J.D.**: Victim J.D. suffered the greatest financial loss of any of Haithcock's individual victims: $110,000. As the bank records and the contemporaneous text messages show, these funds game from various savings accounts that Victim J.D. held individually and with his wife. (At one point, Victim J.D. needed Haithcock's assistance in persuading his wife to go along with the plan.) Text messages indicate that this was approximately 15 percent of Victim J.D.'s total retirement funds. Exhibit 2 at 3 (Victim J.D. noting that he has approximately $800,000 saved).

- **Victim K.D.H.:** Victim K.D.H. transferred $50,000 to Haithcock. While this alone is a significant sum, $40,000 of this was from a retirement account. Exhibit 4 at 19-21.

- **Victim M.H.:** Victim M.H. transferred over $11,075 to Haithcock for purported investments. See Exhibit 1; Exhibit 13. As Victim M.H. explains in his victim impact statement: "I ended up entrusting [Haithcock] with just about all I had saved at that moment and that left me with nothing." Exhibit 6 at 5. Rather than managing his own money and having "something to fall back on in the end," Victim M.H. is "still fighting to get back to" where he was financially before transferring them to Haithcock. *Id.* "I know that those funds could have helped me invest in myself." *Id.*

- **Victim P.S.:** Victim P.S. sent $6,000 to Haithcock for him to invest on her behalf. Exhibit 1; Exhibit 6 at 6; Exhibit 14. She lost all of it. A widow from Havre de Grace, she

17

explained in her victim impact statement that she "invested to get money to replace my roof, furnace and carpet, all over 20 years old." (Victim Impact Statements) Exhibit 6 at 6. After Haithcock took the money she couldn't complete any of these needed repairs: "I was not able to use the money that I needed. Lack of money caused me to put the things on hold that I needed." *Id.*

Haithcock stole funds from 64 individual victims in this scheme. As shown above, the funds he stole came from retirement accounts and savings that individual victims were relying upon. Haithcock's offenses resulted in "significant financial consequences" that required victims to "work[] hard to move forward and rebuilt." Exhibit 6 at 1; *see also generally* Exhibit 6 (additional victim impact statements). Because Haithcock cause substantial financial hardship to so many, this Court should apply the U.S.S.G. § 2B1.1(b)(2)(B).

2. *Haithcock is not eligible for the §4C1.1 reduction because he personally caused substantial financial harm.*

Haithcock has reserved the right to argue that he is eligible for a two-level reduction under U.S.S.G. §4C1.1 as a zero-point offender. The Court should decline to apply the reduction.

Section 4C1.1 provides that if a defendant received no Criminal History Points and meets ten other specified criteria, the defendant's offense level will be reduced by two additional levels. A defendant can only be eligible for this reduction if he "did not personally cause substantial financial hardship." U.S.S.G. 4C1.1(a)(6). Causing financial hardship to one victim is enough to make a defendant ineligible for the reduction. *See, e.g., United States v. Ortiz*, No. 19-CR-161, 2023 WL 1929690, at *5 (E.D.N.Y. Feb. 10, 2023) (finding that the defendant caused significant financial hardship due to his misappropriation of funds from a single victim). In determining whether a substantial financial hardship occurred, "the court shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to

18

§2B1.1." U.S.S.G. 4C1.1(b)(3). At the same time, "the application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of §2B1.1" U.S.S.G. 4C1.1, Application Note 1.

As shown above, Haithcock caused substantial financial hardship to multiple victims. Victims lost retirement funds (Victim D.S., Victim K.D.H.), fell behind on rent (Victim S.R.), lost funds they had set aside for significant purchases in their lives (Victim W.C., Victim P.S.). Haithcock is not eligible for the zero-point offender reduction.

3.   *Haithcock knew or should have known that at least one of his victims was a "vulnerable victim."*

The vulnerable victim enhancement applies when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." *United States v. Lawson*, 128 F.4th 243, 250–51 (4th Cir. 2025) (quoting U.S.S.G. § 3A1.1(b)(1)). Its application "requires a fact-based explanation" of (1) why a victim "a victim was 'unusually vulnerable due to age, physical or mental condition, or ... otherwise particularly susceptible to the criminal conduct'" and (2) "why the defendant knew or should have known of this unusual vulnerability." *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010) (quoting U.S.S.G. § 3A1.1 cmt. n. 2.); *see also United States v. Fordham*, 400 F. App'x 758, 760 (4th Cir. 2010).

This enhancement applies to Haithcock here. At least two specific victims meet the Fourth Circuit's test for applying the vulnerable victim enhancement: Victim S.R. and Victim D.S. First, both were unusually vulnerable to Haithcock's crime due to their lack of knowledge of financial investing and their financial condition. Both Victim S.R. and Victim D.S. knew little about financial markets, as was made clear by their text messages with Haithcock. Victim D.S. even said as much in answering Haithcock's first questionnaire. Further, both Victim D.S. and Victim S.R. were in a vulnerable financial condition. Neither had enough money to actually invest with

Haithcock when they were first texting him. Nevertheless, Haithcock crafted the illusion that he had fronted the investment for each of them, and they would eventually pay him pay over time. Victim D.S. and Victim S.R. then paid Haithcock their initial investment later—Victim D.S. in apparent installments. In this way, Haithcock was able to both make Victim S.R. and Victim D.S. think they were receiving a rare opportunity, when in reality Haithcock had arranged for them to transferred their limited disposable income to him as they saved it.

As such, Haithcock knew that both Victim S.R. and Victim D.S. presented these vulnerabilities. As explained throughout this memo, both Victim S.R. and D.S. were in constant communication with Haithcock via text. In addition to the texts discussed above, Victim S.R. told Haithcock upfront that she was broke. Victim D.S. told Haithcock that he made $45,000 a year, and that he was grateful that Haithcock was handling his investments. Haithcock knew that these victims were vulnerable: unfamiliar with financial investments, in poor financial circumstances, and willing to trust him.

Such facts satisfy the vulnerable victim enhancement under Fourth Circuit law. For example, in *United States v. Fordham*, 400 F. App'x 758, 759 (4th Cir. 2010), the Court upheld the district court's application of the vulnerable victim enhancement where the defendant "targeted homeowners who had substantial equity in their homes but were having difficulty making their mortgage payments." Similarly, in *United States v. Holmes*, 60 F.3d 1134, 1136–37 (4th Cir.1995), the panel held that victims who were sought out by the defendant because they had poor credit and obtained mortgage loans from him, were vulnerable victims. These holdings fit Haithcock's conduct, where he identified Victim S.R. and Victim D.S. and unsophisticated victims, devised a "payment plan" to take advantage of their lack of expendable income, and scammed them into thinking they were growing funds that would help them in their circumstances.

20

IV.     **Section 3553(a) and the Appropriate Sentence**

As this Court is well aware, it must impose a reasonable sentence that is sufficient but not greater than necessary to achieve the goals of sentencing, based on multiple factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need "to promote respect for the law," the need for just punishment without unwarranted sentencing disparities and the need for both specific and general deterrence. 18 U.S.C. § 3553(a). The government will address all of these factors at the sentencing hearing, but addresses some of them below. Based on these factors, a total overall sentence of 63 months' imprisonment is appropriate.

As to the nature and circumstances of the offenses, Haithcock scammed over five dozen people out of their retirement funds, savings, and cash. He did so by selling his victims a lie. He dangled extravagant returns, posed as a sophisticated investor, shared "newsletters" and "status reports" with investment buzzwords. As the texts with his victims show, Haithcock convinced his purported "clients" that they were investing in long term "trades" and "positions" that needed to sit and mature—lest they get hit with tax penalties for early withdrawals. This allowed Haithcock to use the funds himself, without fear that his victims would want to close their non-existent savings accounts.

This was not an isolated crime. It was not a one-time mistake. It took years of effort and repeated dishonesty for Haithcock to execute this scheme. Haithcock needed to first convince his victims that he was an experienced professional. That required, in part, crafting professional-sounding pitch materials. Once they had contributed money, he needed to convince them that their money was growing. The text messages discussed show that Haithcock tracked his victim's contributions in order to provide them with status reports tracking their purported investments.

After he signed them up, Haithcock would return to old "clients" and extract more money. This usually involved pitching a new "investment opportunity." These pitches were replete with real stocks and investment jargon. In other words, Haithcock worked hard to tailor these "opportunities" to the type of unsophisticated investor he targeted.

Indeed, the intimacy and planning of Haithcock's deception is striking and highlights the need for specific deterrence. Haithcock did not defraud a faceless government program. He defrauded working class neighbors and acquaintances who were referred to him because of his purported trustworthiness. Frequently, Haithcock would send his potential victims a questionnaire that asked, in part, whether they knew basic investment terms, had invested before, or knew Company #1 (the company Haithcock pretended to work for). This allowed him to continue his scheme with victims who were inexperienced with investing, and predisposed to trust a seemingly friendly and knowledgeable advisor.

Haithcock engrained himself with many of these victims. Victim D.S., for example, invited him to his family's Thanksgiving dinner. Haithcock proceeded to meet with Victim D.S. in person multiple times, including visiting the church where D.S. was pastor. Haithcock complimented Victim D.S. on his sermon afterward. He did all of this while stealing Victim D.S.'s money, using it to live a lifestyle Haithcock would otherwise not have been able to afford. Haithcock repeated this behavior throughout his scheme with other victims.

Sophisticated fraud schemes like Haithcock's also require general deterrence. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations omitted). Cases such as this involving individual benefits fraud, insider access to computers and government databases, and

the use of false documents as well as the improper use of real documents with authentication features are difficult to detect. The Fourth Circuit has recognized the importance of incarceration for defendants convicted of similarly elusive white-collar crimes such as tax evasion, theft, fraud, and embezzlement. *See, e.g.*, *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010); *see also See United States v. Slavin*, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022) (recognizing "enhanced value" of white-collar prosecution as means of "general deterrence" where "perpetrators often calculate the financial gain and risk of loss" and that "Congress, in adopting the Sentencing Factors at 18 U.S.C. § 3553(a), determined general deterrence to be particularly important in the area of white-collar crime") (quoting S. Rep. No. 98-225, at 76 (1983)) (internal citations and quotation marks omitted).

The government acknowledges that Haithcock appears to have had a difficult childhood and upbringing. PSR at 10. But this background cannot fully explain the severity of Haithcock's conduct. Haithcock chose repeatedly to defraud people he knew and interacted with regularly in order to steal hundreds of thousands of dollars from their hard-earned savings. He did so for years. Such conduct—even when committed by someone with Haithcock's background—merits as significant sentence.

## V.    <u>Restitution</u>

In his plea agreement, Haithcock agreed to restitution "for the full amount of the victims' losses," which the parties stipulated was at least $657,138.93. Upon reexamining its financial calculations, the government asks that this Court impose restitution of $655,498.93. The calculation of this restitution is outlined in Exhibit 1.

## CONCLUSION

For the reasons set forth herein and further discussed at the sentencing hearing, the

Government respectfully requests that the Court sentence Haithcock as follows:

- A total period of 63 months' incarceration in the Bureau of Prisons ("BOP"),
- Supervised release of three years; and
- Restitution of $655,498.93 to the victims outlined in Exhibit 1.

Respectfully submitted,

Kelly O. Hayes
United States Attorney


  /s/
Joseph L. Wenner
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's filing was served via email on the defendant's counsel.

_____/s/_____
Joseph L. Wenner
Assistant United States Attorney